[No. 53349-5-I. Division One. January 31, 2005.]

KENNETH HUMES, *Respondent*, v. FRITZ COMPANIES, INC., ET AL., *Appellants*.

---

[6] Conclusion of law 4; Clerk's Papers at 38.

478

480

*William R. Hickman* (of *Reed McClure*), for appellants.

*David A. Kohles* (of *David A. Kohles, Inc., P.S.*) and *Kenneth W. Masters, Charles K. Wiggins,* and *Shelby R. Frost* (of *Wiggins & Masters, P.L.L.C.*), for respondent.

¶1 COLEMAN, J. — Kenneth Humes sued the defendants for an injury he suffered outside the Tulalip Indian Reservation casino. At the time of the injury, Joe Crowder was driving a truck for Fritz Companies and Humes was operating a crane. Humes loaded a container onto Crowder's truck, and Crowder began to drive his truck away before anyone could detach the cable of the crane from the container. The truck pulled on the crane cables and lifted the crane off its rear. Humes jumped out of the crane cab in fear that the truck would pull the crane end-over-end. Crowder stopped his truck before any damage would have happened to Humes inside the crane cabin. But Humes broke his leg when he landed on the asphalt of the casino's parking lot.

¶2 Humes sued Crowder and Fritz (the Fritz defendants). On pretrial motions for partial summary judgment, the trial court held that the trier of fact could not allocate fault for Humes' injury to the Tulalip Tribes (the Tribe) and that Humes was not contributorily negligent. At trial, the court included a "duty to see" instruction in the jury instructions. The court did not instruct on contributory negligence, and it gave an instruction on proximate causation that did not specifically allow for consideration of Humes' jump as an independent, intervening cause of his injury. The jury returned a verdict in favor of Humes. Following denial of their motion for a new trial, the Fritz defendants appeal.

¶3 We conclude that the Tribe's sovereign immunity does not bar the allocation of fault to the Tribe. Furthermore, the actions of the casino's maintenance director raise a genuine issue of material fact as to whether the Tribe retained control of the workplace. We therefore reverse the trial court's partial summary judgment that the trier of fact could not allocate fault to the Tribe.

¶4 The trial court correctly granted partial summary judgment for Humes on the issue of contributory negligence, as no reasonable jury could find that Humes acted unreasonably in the face of an emergency. For the same reason, the trial court did not err in refusing to instruct on contributory negligence. Additionally, the trial court did not err in submitting a "duty to see" instruction under the factual circumstances presented. The trial court's proximate causation instruction was adequate, as Humes' jump was a foreseeable result of Crowder's actions and therefore did not constitute an independent, intervening cause of his injury.

## FACTS

¶5 In April 2000, Kenneth Humes was operating a crane at the Tulalip Casino on the Tulalip Indian Reservation near Marysville, Washington. The casino management wanted containers moved from one area of the casino parking lot to another. The company that leased the containers to the casino hired Fritz Companies to supply two trucks with drivers. The casino hired Humes' employer, Shaffer Crane & Equipment, to supply a crane and a crane operator for loading the containers onto the trucks and unloading them at the destination.

¶6 Shaffer assigned Humes to the job and provided a 40-ton mobile crane for Humes' use. During operations, Humes sat in a glass-and-frame cabin at the base of the crane boom. He loaded and unloaded six containers without any problem. When he loaded the seventh container onto Crowder's truck, Crowder began to drive his truck away

before anyone disconnected the cables of the crane. The truck pulled on the crane cables and lifted the crane off its rear. Humes jumped out of the crane cabin in fear that the crane would be pulled completely over its front end. He suffered a broken leg when he landed on the ground. The truck stopped before the crane was pulled over.

¶7 An official from the Washington State Department of Labor and Industries (L&I) investigated the incident later that day. An L&I inspection report quotes Crowder as saying that his action was a "conditioned reaction." According to the report, the direct cause of the injury was Crowder's act of driving away. The report also states that an indirect cause of the accident was the fact that Humes jumped out of his crane cabin. The report states that "equipment operators [normally] ride the equipment as it falls over. The protection the cab offers versus the possibility of having the equipment roll over the operator is the reason why operators don't jump out of the equipment."

¶8 Humes brought a personal injury suit against Crowder and Fritz Companies. The Fritz defendants asserted multiple affirmative defenses, including the fault of others and contributory negligence of Humes.

¶9 Cornelius Green, Jr., the casino's maintenance director, was deposed during the discovery phase of the action. Green stated that the Tribe owned the Tulalip Casino and that the Tribe wanted the containers moved. He stated that before operations started, "[t]he crane operator, the truck drivers and myself got together and got a basic game plan on how we were going to proceed." When asked who ran the meeting, Green replied,

> I don't know if anyone was running the meeting. As it being my project, I kind of pulled us together, but it was an open discussion, you know. The trucker kind of knew his business, the crane operator knew his business, and I let them. And I just made sure that we all three were on the same page. I've been around trucks and cranes all my life, but one thing I've learned is if they're good at their jobs, you let them be.

Green also stated that he expected Greg Shaffer of Shaffer Crane & Equipment to provide a rigger to connect and disconnect the crane cables and the containers. When Shaffer did not provide a rigger, Green decided that he and casino technician Jeff Lyle would act as riggers. Green also decided he was responsible for making eye contact with the truck driver and motioning for the truck driver to go forward.

¶10 Humes stated during his deposition that he wasn't sure who was in charge of the "lifting operation," then said, "I guess Neil [Green] would be the one, Neil, the guy that was rigging for me. . . . He would be the one in charge of the whole operation." Shaffer stated during his deposition that it was his understanding that Green was in charge of the project.

¶11 Green stated in his deposition that he heard Crowder say during the L&I inspection that the accident was his fault and that he drove away from Humes' crane "on automatic." Crowder, however, stated in his deposition that he could not remember whether he told the L&I official that he drove away under a conditioned reaction.

¶12 Green and Shaffer were asked whether Humes should have stayed in the crane cabin. Green said, "No" and stated, "I would have bailed." Green was asked whether Humes would have been better off if he had stayed in the cab. Green said yes because the crane did not go over. He added:

> But on the other side of that scenario, if the crane would have kept going, that cab was on the wrong side of the crane to get—it was on the right side of the crane to get smashed. It was on the wrong side of the crane to stay in it. He would have been a lot shorter when the episode was finished.

Later in the deposition, Green recalled watching the truck pull the crane off its rear. "We were just standing there like, that guy is taking off. I'm going to see some guy get killed right in front of me. That's what I remember hearing—thinking, you know."

¶13 Shaffer said a "generally accepted notion" exists that a crane operator should stay in the crane cab in the case of tipover and that the cab will protect an operator. Shaffer said he has never seen the rule about staying in the cab written down and added "[t]hat if I was in that cab, or anybody else from what I have seen, I think anybody else would have jumped too."

¶14 Shaffer was questioned about the normal practices involved in loading a container onto a truck. Shaffer said that "he would assume" that while Humes was in the crane and lowering a container, Green and the truck driver would be guiding the container onto the truck. Shaffer was asked, "So you think the truck driver would be out of the cab?" Shaffer said, "I would hope he was, to be honest with you." Shaffer then explained that the truck driver would be outside because two people are needed to guide a container onto a truck.

¶15 Humes stated in his deposition that he had been in a previous crane accident. He was driving a crane when part of the road underneath gave way. The crane went into a ditch and tipped over on its side. Humes stayed in the crane cabin and suffered only minor injuries.

¶16 The Fritz defendants retained safety consultant Ray Wax as an expert witness. In a declaration, Wax stated that the Tribe should have exercised "positive control" over the trucks. Wax stated that the Tribe could have done this by requiring the truck drivers to stay out of their trucks or by placing orange safety cones in front of the trucks during loading operations.

¶17 Wax stated the proximate cause of Humes' injury "was his choosing to ignore common sense and established safety rules and jump from the crane." Wax further stated, "It is standard safety practice for crane operators to remain in their cab with their seat belts on when a crane begins to tip" and that the crane cab and seat belt would have protected Humes if the crane had tipped over. As support for this statement, Wax cited the deposition statements of Shaffer, Humes' description of a previous crane tipover into

a roadside ditch, and the L&I report that Wax claimed "concluded . . . that Mr. Humes should not have jumped from the crane because crane operators are taught to remain in the cab for their own safety." As explained in the analysis section of this opinion, the sources cited by Wax do not provide factual support for his expert opinion.

¶18 Humes retained safety experts George Jamison, Ken Overton, and Troy Corbin as expert witnesses. Overton and Jamison stated in their declarations that a crane operator is not required to stay in the crane cabin when an incident occurs. They also stated that the glass-and-frame cab on Humes' crane was not designed to withstand a rollover or crushing accident and was not capable of providing protection to Humes. Overton additionally stated that crane operators do not rely on a cabin as protection in the event of a tipover or rollover.

¶19 During a deposition, Corbin said that when a crane operator moves a container onto a truck, the container is part of the crane operation until it is detached from the crane. Overton stated during his deposition that the crane operator is the primary individual responsible for crane operations. Overton also stated that while a load is rigged to a crane, the load is part of the crane operation and that a crane operation does not cease until after the load is unhooked.

¶20 On motions for summary judgment, the trial court held that the trier of fact could not allocate fault to the Tribe and that Humes was not contributorily negligent as a matter of law.

¶21 During trial, many witnesses were asked whether Humes should have stayed in the cabin or whether they knew of a rule that a crane operator should stay in the cabin during a tipover. Humes testified that he had heard of an unwritten version of this rule after the accident. Humes also said,

> It's just what I've heard out on some of the union picket lines where people say, it's just kind of a rumor, but I've had a lot of

operators tell me they could take me out and show me cranes where people should have jumped out of the cab. And I know myself where people should have jumped out of the cab and they're not with us anymore.

Report of Proceedings (RP) (Sept. 29, 2003) at 21.

¶22 Timothy Stenerson, the second truck driver, testified that he was surprised that Humes leaped from his crane cabin "because the first thing that I was taught as an equipment operator is, you buckle yourself in and you stay in the equipment, because if it rolls over, there's a chance it could roll over on you." RP (Sept. 29, 2003) at 171. Under cross-examination, Stenerson was asked who he thought was in charge of "the operation." Stenerson said, "the crane operator." RP (Sept. 29, 2003) at 176.

¶23 Crowder was asked during cross-examination whether he believed that his driving away and tipping the crane was a reason for Humes to jump. Crowder replied, "Not according to what you're taught. You were taught to stay in the crane." When pressed, Crowder said, "It could have—it could have been a reason." RP (Sept. 30, 2003) at 89.

¶24 Crowder also said that he spoke with Humes before operations began and that he thought Humes would be in charge of the operation.

A I asked [Humes]—I hadn't—hadn't done this before, and I just asked him how we were going to do it.

Q What did [Humes] tell you?

A He said to do what he told me to do. That he had done it a million times, and said that we do this all the time. Just do what I tell you.

Q And what did he tell you?

A Nothing. I got back in my truck, and I thought that when he said do what I tell you that mean [sic] that he would tell me when to go, and when to stop, and, you know, that he would be in charge of the operation.

RP (Sept. 30, 2003) at 103.

¶25 Crowder and Stenerson testified that the side mirrors on their trucks had blind spots. Crowder testified that he had difficulty seeing height in his mirror, as well as areas close to the sides of his truck. He also testified that before he started his truck, he looked back around and did not see the ladder or the cables.

¶26 Crowder was asked whether he would have seen the cables if he had gotten out of his truck. He said, "I don't know. Yeah, I would imagine so; yes." RP (Sept. 30, 2003) at 87. When asked about the events leading up to the accident, Crowder said,

> I must have looked away or something, you know, done my paperwork or something. I don't—you know, I assumed that the ladder had gone up, and it had been a couple of minutes and I looked back around, and I didn't see cables, and I didn't see the ladder. So I started to pull away.

RP (Sept. 30, 2003) at 106.

¶27 During cross-examination, Crowder was asked, "And if you don't have somebody on the outside of your truck looking and telling you that it's good to go, isn't it your obligation as a truck driver to make sure that it's safe to go? By visually seeing; isn't that true?" Crowder replied, "Yes." RP (Sept. 30, 2003) at 116.

¶28 At the end of the trial, the court gave the *Washington Pattern Jury Instruction* 12.06 "duty to see" instruction submitted by Humes. It reads, "Every person has a duty to see what would be seen by a person exercising ordinary care." 6 WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 12.06, at 148 (5th ed. 2005) (WPI). The Fritz defendants objected. During closing arguments, Humes' counsel referred to this instruction when he said, "And the reason [the instruction is] important here, if it wasn't obvious already, is Mr. Crowder had the ability to see what they were doing outside his truck." RP (Oct. 1, 2003) at 141.

¶29 The trial court also gave an instruction on proximate cause. The instruction reads, "A cause of an injury is a proximate cause if it is related to the injury in two ways: (1)

the cause produced the injury in a direct sequence, and (2) the injury would not have happened in the absence of the cause." The Fritz defendants objected and argued that this instruction failed to include the phrase "unbroken by any new independent cause," which appears in WPI 15.01 and 15.01.01, after the phrase "the cause produced the injury in a direct sequence" and therefore incorrectly stated the law on proximate cause. RP (Oct. 1, 2003) at 97. The court denied the Fritz defendants' objection, reasoning that no factual basis existed for terming Humes' leap from the crane cabin as a new independent, intervening cause.

¶30 The Fritz defendants submitted jury instructions regarding contributory negligence, which the court rejected. The Fritz defendants objected.

¶31 The jury found for Humes and awarded damages. The court entered judgment and denied a motion by the Fritz defendants for a new trial and vacation of the judgment. The Fritz defendants appeal the partial summary judgment that fault could not be allocated to the Tribe and that Humes was not contributorily negligent. They also appeal the court's decisions on the jury instructions, the judgment, and the denial of the motion for a new trial and vacation of the judgment.

## ANALYSIS

¶32 We begin by analyzing the partial summary judgment on the issue of allocation of fault to the Tribe. In a summary judgment motion, the moving party must show the absence of an issue of material fact. *Iwai v. State*, 129 Wn.2d 84, 95, 915 P.2d 1089 (1996). An appellate court reviewing a summary judgment must engage in the same inquiry as the trial court. *Iwai*, 129 Wn.2d at 96. All evidence and all reasonable inferences must be considered in a light most favorable to the nonmoving party. *Iwai*, 129 Wn.2d at 96. Humes argues that the Tribe is a sovereign entity and as such, the State cannot impose a duty of care upon it. Absent a duty, Humes argues, the Tribe cannot be

negligent or reckless and, therefore, the trier of fact cannot allocate fault to it.[1] Humes further argues that even if the Tribe did not enjoy sovereign immunity, the Tribe is not liable for Humes' injury because he was the employee of an independent contractor. The Fritz defendants, on the other hand, argue that although the Tribe enjoys sovereign immunity, it still is capable of fault. The Fritz defendants also argue that a genuine issue of material fact exists as to whether the Tribe retained sufficient control over the worksite through Green, the gaming resources manager of the casino, so as to assume responsibility for Humes' injury.

■■ ¶33 The Fritz defendants do not dispute the first part of Humes' argument—that the Tribe enjoys sovereign immunity and that the State lacks jurisdiction over the Tribe to enforce a common law duty of care. State laws generally are not applicable to tribal Indians on Indian lands except where Congress has expressly provided that state laws shall apply. *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 170-71, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973). In Washington, state jurisdiction over Indians is exercised within the limits of the federal act of Public Law No. 280. RCW 37.12.010. The legislative history of section 4(a) of Public Law No. 280 does not demonstrate an intent to confer general state civil regulatory control over Indian reservations. *Bryan v. Itasca County*, 426 U.S. 373, 384-85, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976). Under this doctrine, the State lacks the jurisdiction to enforce a standard of care on the Tribe for conditions at the worksite outside the casino on the day of the accident.

■■ ¶34 But this does not resolve the inquiry of whether the trier of fact can attribute fault to an Indian tribe in a lawsuit against a separate party. Under Washington tort law, fault will be attributed to every entity that caused a plaintiff's injury, including entities that are im-

---

[1] "Fault" includes acts or omissions that are negligent or reckless toward the person or property of the actor or others. RCW 4.22.015.

mune to a suit from a plaintiff. RCW 4.22.070(1).[2] The statute evidences an intent by the legislature that entities such as the Fritz defendants pay only their own proportionate share of damages. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 294, 840 P.2d 860 (1992). The statute also clarifies that a plaintiff such as Humes should not recover for fault attributable to immune parties. *Washburn*, 120 Wn.2d at 294. Under these principles, the Tribe's sovereign immunity does not bar the allocation of fault to it in a negligence action against the Fritz defendants.

¶35 Humes relies on *Price v. Kitsap Transit*, 125 Wn.2d 456, 462, 886 P.2d 556 (1994), to argue that the Tribe is not an entity capable of fault and therefore cannot be allocated fault under RCW 4.22.070(1). But *Price* does not support this argument. In *Price*, our Supreme Court ruled that an entity to whom fault is allocated under RCW 4.22.070(1) must be a juridical being capable of fault. *Price*, 125 Wn.2d at 461. Animals, inanimate objects, and forces of nature, for example, are not juridical beings capable of fault and cannot be attributed fault under RCW 4.22.070(1). *Price*, 125 Wn.2d at 461. A child under the age of six is not a juridical being capable of fault because the child lacks the mental capacity to understand a duty of care. *Price*, 125 Wn.2d at 461-62. Humes argues that the Tribe is not a juridical being capable of fault because sovereign immunity bars the State from imposing a duty of care. But the *Price* decision makes it clear that immunity and incapacity are different concepts and that immune entities can be capable of fault. "Juridical beings *capable* of fault, but excused for policy reasons from incurring liability, are conceptually distinct from beings or objects *incapable* of fault." *Price*, 125 Wn.2d at 462-63. The Tribe is a juridical being clearly capable of fault. Sovereign immunity protects the Tribe

---

[2] In a suit involving the fault of more than one entity, the finder of fact will determine the percentage of the total fault that is attributable to every entity that caused the claimant's damages. "The entities whose fault shall be determined include the claimant or person suffering personal injury or incurring property damage, defendants, . . . *and entities immune from liability to the claimant.* . . . " RCW 4.22.070(1) (emphasis added).

from being subject to suit or incurring liability, but it does not render the Tribe incapable of fault.

■■ ■ ¶36 Humes separately argues that a trier of fact cannot attribute fault to the Tribe because employers such as the Tribe are not liable to independent contractors. The Fritz defendants do not dispute the claim that Humes was acting as an employee of an independent contractor, but they contend that the evidence raises a genuine issue of fact as to whether the Tribe retained sufficient control of the workplace to bring the Tribe under the "retained control" exception to the general rule of nonliability. Employers generally are not liable for injuries incurred by independent contractors because employers cannot control the manner in which independent contractors work. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 119, 52 P.3d 472 (2002). An employer can be held liable for injuries incurred by an independent contractor if the employer retained control over the manner in which the independent contractor worked. *Kamla*, 147 Wn. 2d at 119; *Kinney v. Space Needle Corp.*, 121 Wn. App. 242, 247, 85 P.3d 918 (2004). The proper inquiry for the retained control test is whether the employer retains the right to direct the manner in which the work is performed, not simply whether the employer actually exercises control. *Kamla*, 147 Wn. 2d at 121; *Kinney*, 121 Wn. App. at 247. A party prevails on its motion for summary judgment if the evidence, viewed in a light most favorable to the nonmoving party, shows that there is no genuine issue of material fact regarding retained control. *Kinney*, 121 Wn. App. at 247 n.3.

¶37 When the evidence is seen in the light most favorable to the Fritz defendants, it raises a genuine issue of material fact regarding retained control by the Tribe. Humes and Shaffer believed that the operations were under the direction of Green, the gaming facilities maintenance director of the Tulalip Casino. Furthermore, the circumstances indicate that Green did retain control over how Humes and the truck drivers did their work. Green took the initiative of calling together everyone for a safety meeting.

He decided that he would be the person to signal to the truck drivers when they should leave. He assigned himself the rigging responsibilities and chose his own assistant. A genuine issue of material fact exists as to whether the Tribe retained control over worksite operations and can therefore be allocated fault for Humes' injury.

¶38 Humes further contends that even if the Tribe retained control of the workplace, the Tribe did not proximately cause his injury. Humes claims that Crowder admitted during the L&I investigation that he pulled his truck away "on automatic" and that a failure by Green to coordinate hand signals or to use other safety measures was therefore not a cause of Humes' injury. Even if Green had all these protections in place, Humes argues, Crowder still would have driven away.

¶39 A genuine issue of material fact still exists on the issue of proximate causation. Crowder stated in his deposition that he could not remember telling the L&I inspector that he drove his truck away without thinking. Furthermore, Wax stated in his declaration that the Tribe could have controlled the actions of Crowder and Stenerson by placing orange cones in front of their trucks or requiring them to stay out of their trucks during the loading process. Either one of these procedures might have prevented Crowder from leaving until the crane cables were disconnected. A reasonable finder of fact could therefore decide that a breach of a duty by the Tribe was a proximate cause of Humes' injury. Because fault can be allocated to an immune entity and because genuine issues of fact exist as to retained control and proximate cause, we conclude that Humes is not entitled to partial summary judgment on the issue of allocation of fault to the Tribe.

¶40 We next examine the Fritz defendants' argument that the trial court erred in granting summary judgment to Humes on the issue of contributory negligence. The Fritz defendants argue that Humes acted negligently when he jumped from the cabin of his crane and that this negligence was a proximate cause of his injury. Humes asserts that he

is shielded by the emergency doctrine. The Fritz defendants acknowledge that Humes faced an emergency when his crane was lifted off its rear, but argue that a jury could still find that Humes did not act as a reasonably prudent and careful person would have acted. The Fritz defendants also argue that a finder of fact could decide that Humes contributed to the emergency and therefore cannot rely on the emergency doctrine.

■■■ ¶41 Under the emergency doctrine, a person who is suddenly confronted by an emergency through no negligence of his or her own and who is compelled to decide instantly how to avoid injury and who makes such a choice as a reasonably careful person placed in such a position might make, is not negligent even though it is not the wisest choice. WPI 12.02. *See Haynes v. Moore*, 14 Wn. App. 668, 669, 545 P.2d 28 (1975). The existence of an emergency does not alter or diminish the standards of care imposed by law upon the actors. The test is and remains that of ordinary care under the circumstances. *Curtis v. Blacklaw*, 66 Wn.2d 484, 492, 403 P.2d 358 (1965); *Locker v. Sammons Trucking Co.*, 10 Wn. App. 899, 902-03, 520 P.2d 939 (1974).

■■■ ¶42 Humes is entitled to summary judgment on the issue of contributory negligence. When Crowder drove his truck away before the crane cables were detached, the truck pulled the crane off its rear. If the truck had not stopped, the crane easily could have flipped over and killed or injured Humes. The evidence before the court clearly demonstrated that Humes was placed in a position of peril and that he had to make an instant choice between courses of action to avoid the peril. The evidence additionally establishes that a reasonably careful person might have chosen to jump from the cabin of the crane rather than risk injury. No reasonable jury could decide otherwise. Humes therefore satisfied the requirements of the emergency doctrine.

¶43 The Fritz defendants argue that a genuine issue of material fact still exists as to whether Humes exercised ordinary care in jumping from the crane cabin. They cite statements from Shaffer and the L&I report that attest to

an industry rule that crane operators should stay in their cabins during a possible tipover. But even when these statements are viewed in the light most favorable to the Fritz defendants, they do not raise a genuine issue of material fact as to contributory negligence. Assuming that Humes knew or should have known of a general industry rule to stay in the crane cabin during possible tipovers, Humes still faced a serious risk of death or injury if he stayed in the glass-and-frame cabin at the base of the crane boom. If he had not jumped and if Crowder had not stopped, the 40-ton crane likely would have been pulled completely over its front end and Humes likely would have been killed or injured. The act of jumping was therefore within the range of acceptable actions that a reasonable person in Humes' situation could take. The possible existence of the general industry rule does not raise a triable issue of fact whether Humes violated a duty of ordinary care in his unique situation.

¶44 The defendants also cite the expert opinion by Wax, in which Wax states that Humes ignored common sense and established rules when he jumped and that the crane cabin and seat belt would have protected him. At first blush, this would seem to raise a triable issue of fact. But the facts in the sources cited by Wax fail to support his opinion. The L&I report attests to the general industry rule about staying in the cab and notes that Humes' leg would not have been broken if he had not jumped, but it does not conclude that Humes acted unwisely in the face of an imminent emergency. Shaffer and the L&I report state that a general belief exists that the cabin will protect an operator in case of a tipover. But they do not demonstrate that Humes' glass-and-frame cabin would have protected him if the 40-ton crane had been pulled completely over its front end. In fact, Shaffer states that he would have jumped under the same circumstances. Humes stated during his deposition that he suffered minor injuries when a crane tipped over onto its side in a ditch. This does not establish that the crane cabin would have protected Humes if the crane had been flipped over by Crowder's truck.

¶45 The Fritz defendants further argue that a genuine issue of material fact exists regarding whether Humes allegedly caused the emergency through his own negligence. To support this argument, they cite the statement by Shaffer that he assumed the crane operator would have the truck driver get out of the truck and help guide the container onto the truck. They also cite statements by Corbin and Overton that a crane operator is primarily responsible for the operations of the crane and that a crane operation continues at least until the load is unhooked. The Fritz defendants claim that these statements raise a genuine issue of material fact whether Humes contributed to the emergency. But Shaffer assumed that Humes would have the truck driver get out of the truck only because a second person would be needed to help guide the container onto the truck, not for the safety of the crane operator. Green already had an assistant and therefore did not need the truck driver's assistance. Furthermore, the evidence indisputably establishes that the emergency was caused by Crowder's operation of his truck, not by Humes' operation of the crane. The fact that Crowder drove his truck away before the conclusion of the crane operation does not imply negligence on the part of the crane operator. There is no reasonable inference that will support the Fritz defendants' argument.

¶46 For the same reasons, the trial court did not err in declining to submit jury instructions regarding contributory negligence. Under Washington law, a defendant is entitled to a jury instruction on contributory negligence if substantial evidence is presented to support a finding. In such a situation, a court errs if it refuses to instruct the jury on contributory negligence and instead directs a verdict. *Clements v. Blue Cross of Wash. & Alaska, Inc.*, 37 Wn. App. 544, 553, 682 P.2d 942 (1984). The Fritz defendants argue that the jury heard substantial evidence of contributory negligence when Humes testified about learning of a rule to stay inside the crane cabin and when Crowder and Stenerson testified about being trained to stay with the

equipment. But this testimony does not controvert the evidence establishing that Humes had to make a sudden decision during an emergency and that a reasonable person in Humes' unique situation might have jumped to avoid death or injury.

¶47 The Fritz defendants further argue that the jury heard substantial evidence that Humes had contributed to the emergency when Crowder and Stenerson testified that they thought Humes was in charge of operations and when Crowder testified that he thought Humes would tell him when to go and when to stop. But this testimony does not raise an inference that Humes contributed to an emergency created when Crowder drove his truck away from the crane before anyone could disconnect the cables. The trial court therefore did not err in deciding not to give the jury instructions on contributory negligence.

¶48 We next examine the Fritz defendants' argument that the trial court erred in giving a jury instruction that read, "Every person has a duty to see what would be seen by a person exercising ordinary care." The Fritz defendants argue that this instruction overemphasizes Humes' theory of the case concerning Crowder's ability to see behind his truck despite blind spots and problems with height. As proof that the jury instruction overemphasizes this aspect of Humes' case, the Fritz defendants cite the closing argument of Humes' counsel, during which counsel said, "The reason [the instruction is] important here, if it wasn't obvious already, is Mr. Crowder had the ability to see what they were doing outside his truck." RP (Oct. 1, 2003) at 141. Humes argues that he does not claim that Crowder did not have blind spots in his mirror or that Crowder did not have problems seeing height in his mirror. Humes argues instead that Crowder would have seen the cables if he had stepped outside his truck and that he had an obligation to make sure it was safe to go.

¶49 Caution should be used in giving the "duty to see" instruction. It is reversible error to give this instruction if the instructions as a whole " 'so repetitiously cover a point

of law as to generate a gross overweighting in favor of one party.'" 6 WPI 12.06, cmt. at 148 (quoting *Hinkel v. Weyerhaeuser Co.*, 6 Wn. App. 548, 553, 494 P.2d 1008 (1972)). *See Dorr v. Big Creek Wood Prods., Inc.*, 84 Wn. App. 420, 431-32, 927 P.2d 1148 (1996).

¶50 The "duty to see" instruction in this case did not generate a gross overweighting in favor of Humes. The jury instruction does not overemphasize Humes' theory regarding Crowder's ability to see from inside his truck. The instruction instead asks the jury to determine whether a truck driver exercising ordinary care would have stepped outside the truck to see whether he could drive away. The use of this instruction was justified by Crowder's testimony that he could have seen the cables if he was outside the truck and that he had an obligation to make sure it was safe to proceed. Therefore it was not error to give the "duty to see" instruction.

¶51 The Fritz defendants also claim that the trial court erred in giving an instruction on proximate cause that did not include the phrase "unbroken by any new independent cause." They first argue that the court erred in giving a proximate cause instruction that deviated from WPI 15.01[3] and WPI 15.01.01.[4] The *Washington Pattern Jury Instructions* are an immense aid to the bench and bar in selecting appropriate jury instructions. *Stevens v. Gordon*, 118 Wn. App. 43, 53, 74 P.3d 653 (2003). They are to be used in preference to individually drafted instructions, but are not absolutely required. *Stevens*, 118 Wn. App. at 53. The specific language of jury instructions is

---

[3] "The term 'proximate cause' means a cause which in a direct sequence [unbroken by any new independent cause,] produces the [injury] [event] complained of and without which such [injury] [event] would not have happened.

"[There may be more than one proximate cause of an [injury] [event].]" 6 WPI 15.01, at 179.

[4] "A cause of an [injury] [event] is a proximate cause if it is related to the [injury] [event] in two ways: (1) the cause produced the [injury] [event] in a direct sequence [unbroken by any new, independent cause], and (2) the [injury] [event] would not have happened in the absence of the cause.

"[There may be more than one proximate cause of an [injury] [event].]" 6 WPI 15.01.01, at 183.

within the discretion of the trial court. *Stevens*, 118 Wn. App. at 53. Because the *Washington Pattern Jury Instructions* are not absolutely required and because a trial court has discretion in deciding the specific language of jury instructions, a deviation from the language of the *Washington Pattern Jury Instructions* does not necessarily constitute error.[5]

¶52 The Fritz defendants further claim that the trial court rejected the use of the phrase "unbroken by any new independent cause" under a misapprehension that the phrase referred to an intervening cause. This claim is without merit because the phrase indeed refers to an intervening cause. Under the doctrine of superseding cause, an independent cause that breaks the causal connection between the defendant's negligence and the plaintiff's injury is an intervening cause of the injury. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 482, 951 P.2d 749 (1998). When an intervening cause breaks the causal connection between the defendant's negligence and the plaintiff's injury, the defendant's negligence is not a proximate cause of the injury. *Schooley*, 134 Wn.2d at 482. The phrase "unbroken by any new independent cause" does not use the word "intervening," but an independent cause that breaks the causal connection between negligence and injury is an intervening cause.

¶53 The Fritz defendants alternatively argue that a jury could find that Humes' jump constituted an intervening cause of his injury and that the refusal of the court to include the phrase constitutes a legal conclusion on a question for the jury. Instructions are sufficient if they correctly state the law, are not misleading, and permit the parties to argue their respective theories of the case. *Bulzomi v. Dep't of Labor & Indus.*, 72 Wn. App. 522, 526, 864 P.2d 996 (1994). A party has a right to have his or her theory of the case presented to the jury if there is substan-

---

[5] Furthermore, the phrase "unbroken by any new, independent cause" in WPI 15.01 and WPI 15.01.01 appears in brackets, which indicate that the phrase should be used "as applicable." 6 WPI 15.01, note on use at 179.

tial evidence to support it. *Bulzomi*, 72 Wn. App. at 526. But a plaintiff's action may rise to the level of an independent, superseding cause of injury only when the act is so highly extraordinary or unexpected that it can be said to fall outside the realm of reasonable foreseeability. *Cramer v. Dep't of Highways*, 73 Wn. App. 516, 870 P.2d 999 (1994).

¶54 The Fritz defendants argue that they presented sufficient evidence to support an argument that Humes' leap was not reasonably foreseeable. This evidence was Stenerson's testimony that he was trained to stay with his equipment during a rollover and that he was therefore surprised and shocked to see Humes jump. But Stenerson's testimony is not sufficient to support a finding that Humes' jump was not reasonably foreseeable. This testimony does not controvert the evidence showing that Crowder's negligence put Humes in a position where he had to choose between jumping and risking injury or death in a flipover. Given the circumstances, Humes' leap cannot be said to be an unforeseeable act independent of Crowder's negligence. The court therefore did not err in refusing to give a proximate causation instruction with the phrase "unbroken by any new independent cause."

¶55 In conclusion, we reverse the trial court's partial summary judgment order that the Fritz defendants could not use the defense of fault of others. The partial summary judgment that Humes was not contributorily negligent is affirmed. There was no error in the giving of instructions. Because the Fritz defendants are entitled to an allocation of any fault on the part of the Tribe, the jury verdict and judgment therefore are reversed and the cause is remanded for further proceedings consistent with this opinion.

GROSSE and AGID, JJ., concur.

Reconsideration denied March 14, 2005.