IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARIANO ROMULO, | No. 86754-7-I |
| Appellant, | DIVISION ONE |
| v. | |
| SEATTLE PUBLIC UTILITIES, a Department of the CITY OF SEATTLE, a municipality, | UNPUBLISHED OPINION |
| Respondent. | |

SMITH, J. — In 2007, Mariano Romulo initiated a claim under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, against his employer, Seattle Public Utilities (SPU). The lawsuit settled in 2009. In 2017, SPU terminated Romulo's employment. In 2019, Romulo initiated a complaint asserting (1) hostile work environment, (2) retaliation, (3) wrongful discharge, and (4) harassment.

At trial, the jury returned a verdict in favor of SPU. Romulo appealed. This court affirmed the jury's determination that Romulo was not terminated in violation of the WLAD, but remanded the retaliation claim to the extent it was based on employment actions short of termination. On remand, the jury again ruled in favor of SPU. Romulo appealed, claiming (1) the trial court's jury instructions misstated the law, (2) the trial court misinterpreted the ruling of the Court of Appeals, (3) the case should be remanded and assigned to a new judge, and (4) he should be awarded attorney fees. Because

the trial court's jury instructions correctly stated the law and any misinterpretation of the Court of Appeal's ruling was harmless error, we affirm.

FACTS

<u>Background</u>

In 1993, Mariano Romulo began working for the City of Seattle.[1] In 1995, Romulo joined SPU's water department, and he eventually worked his way up to journeyman pipefitter. In 2007, Romulo initiated a lawsuit against the City, alleging claims under the WLAD. In 2009, Romulo and the City entered a settlement agreement that resolved the lawsuit. As part of the settlement, the City transferred Romulo to SPU's Utility Inspection Group (USI), where Romulo served as a senior utility service inspector. Prior to 2014, Romulo received favorable performance reviews from his direct supervisor, Ward Pavel.

In August 2014, Pavel retired. Vic Roberson, division director and Pavel's former supervisor, oversaw the hiring process for Pavel's replacement. Romulo applied to work "out of class"[2] in the USI manager role, but was not selected. Two of Romulo's peers, Muriel Fair and Bob Eastwood, were selected to serve in the interim role. Both Fair and Eastwood had more experience than Romulo at the time. Romulo then applied

---

[1] Unless indicated otherwise, the facts concerning Romulo's initial trial and appeal come from this court's unpublished opinion in *Romulo v. Seattle Pub. Utils.,* No. 82790-1-I (Wash. Ct. App. Nov. 28, 2022) (unpublished), https://www.courts.wa. gov/opinions/pdf/827901.pdf.

[2] An "out of class" assignment is a temporary assignment "to perform the normal ongoing duties and responsibilities associated with a higher-paying title." *Romulo*, slip op. at 6 n.1.

for Pavel's permanent position and received an interview, but ultimately was not hired. In May 2015, Roberson hired Bob Hubbert to fill Pavel's old position as USI supervisor.

In March 2015, Romulo received a positive performance review from Roberson. It noted that Romulo "gets his work done and consistently completes work on time" and he "is eager to work on projects that improve how we manage and conduct our work."

In April 2015, Romulo submitted a grievance to the City's human resources (HR) department stating, "With the recent retirement of my manager, it has come to surface I am really NOT part of any team. I now find my job meaningless, a death to my dignity, self worth, family, general welfare, and even find my career is now impacting my health." As a remedy to "restor[e] [his] dignity," Romulo made 17 requests, including a $1.5 million bonus and to be appointed to the City's HR department as the executive director of training. Romulo admitted he did not have HR experience. In June 2015, Romulo submitted another grievance to Edward Murray[3] and copied the chief of police and the full city council. In this letter, Romulo requested $60 million as a remedy for SPU not timely resolving his previous grievance.

In October 2015, Hubbert sent an e-mail to Angela Dawson-Milton, employee relations manager at SPU, documenting an interaction he had with Romulo. Hubbert stated that Romulo "immediately became uncomfortably aggressive" with him. Hubbert clarified it was "with his words only," but noted Romulo "escalated to anger very quickly,

---

[3] Murray was Mayor of the City of Seattle at the time.

3

which was not comfortable at all." When asked about the interaction at trial, Romulo testified his aggressive behavior was not targeted "directly at [Hubbert]."

In December 2015, Hubbert e-mailed Richard Groff, an HR representative, enumerating concerns he had about Romulo. Hubbert noted he had received multiple customer complaints about Romulo's unresponsiveness. One customer e-mailed him and expressed frustration because she tried to contact Romulo for months and never received a response. Another customer, USI's biggest customer group, University of Washington, noted Romulo had been unresponsive to its requests. In this e-mail, Hubbert also communicated concern about Romulo's response to a timecard inquiry, where Romulo asked Hubbert if he would rather have him "come in to work angry" and stated he felt a lack of respect from SPU. Hubbert e-mailed Groff again in December 2015, to alert Groff to an interaction he had with Romulo. Hubbert explained that Romulo "elevat[ed]" his voice, seemed "very upset/frustrated/angry," and leaned toward Hubbert in his chair before leaving the work area because he "couldn't be [there] anymore today."

At some point, a performance review was prepared for Romulo covering May 2015 through December 2015. Romulo was rated "below standard" on almost all metrics, that a year before, Pavel had rated him as "above standard." The "Supervisor Rater Comments" section of the review observed,

> Issues primarily related to attendance, focus, attitude, communication skills, and teamwork have impacted [Romulo]'s ability to complete his work in a manner that meets expectations. The results have been issues with productivity and reliability, as well as with customer service. [Romulo] has ignored repeated direction to stay focused on primary work tasks and

has not taken advantage of the support offered to him. His actions have created an uncomfortable environment in the workplace for many and have hindered SPU's ability to protect public health and drinking water quality. My continued expectation is that [Romulo] will take immediate steps to perform at a higher level and to help the Utility Inspection Services team with managing and improving the Cross Connection Control program.

The performance review was not signed and the record is unclear on whether Romulo received the evaluation.

Hubbert's concerns about Romulo continued into 2016. In April 2016, after Romulo failed to respond to a customer, Hubbert reached out to Romulo to request more information about the incident, but Romulo did not respond. Another customer reported to Hubbert that Romulo's voicemail box was full. When Hubbert questioned Romulo, Romulo admitted that he had forgotten his password and had to have it reset by IT. That same month, Hubbert e-mailed Romulo expressing concern over his frequent absences and late arrivals. The e-mail noted that during the two-month period from February 1, 2016 to April 1, 2016—a total of 45 work days—Romulo either did not come to work or arrived late on 36 occasions. No disciplinary action was taken at the time. In May 2016, Romulo failed to respond to Hubbert's inquiry regarding progress on his work after he missed a meeting due to illness.

Shortly after Hubbert e-mailed Romulo about his attendance, Romulo requested to take a vacation day to attend the Filipino American Civic Employees of Seattle (FACES) conference. This was not an "affinity" event,[4] but Hubbert approved Romulo

---

[4] SPU employees were allowed to use two hours of paid city time monthly to attend affinity group activities.

5

to use two hours of vacation time to attend. Hubbert explained to Romulo that, while the event was four hours, Romulo's lunchtime aligned with the event, so he would be able to attend two-and-a-half hours of the event, if he desired. Romulo chose not to attend the event. During trial, Hubbert testified that he did not approve the full four hours because Romulo "fail[ed] to demonstrate that he was staying engaged and focused on his work, stuff that was required to be done in the workplace."

Romulo's coworkers also had concerns about Romulo. In May 2016, after a staff meeting with his team, Hubbert e-mailed Roberson to relay concerns his team had expressed about Romulo. Among other concerns, the staff noted they did "not feel safe" around Romulo, Romulo made them "feel uncomfortable," and the team "would prefer to not be in meetings with him anymore."

In August of 2016, Romulo attended a meeting Hubbert had arranged for Romulo's work group to meet with another SPU work group. After the meeting, Romulo sent an e-mail out to all participants with "draft comments," which included Romulo's personal perspectives and suggestions. That same day, Hubbert responded to Romulo directly and advised Romulo his e-mail was "inappropriate and [was] a violation of the expectations I have communicated to you." Romulo replied to Hubbert, "My focus was to keep you in the loop and take notes for those we did not attend?!! I believe in being inclusive, so please again, explain and elaborate which parts of the email does not meet your expectations?!!" (Emphasis in original.) The next day, Romulo e-mailed a number of SPU employees, including the interim CEO, and proclaimed,

6

I want a meeting to discuss and clear this issue as I am not ok to feel inappropriate and in violations [sic] daily!!

Do not ignore me!!!

I demand this issue address [sic] now!!!!!

My next ask for city of Seattle mayor and councils to address this issue!!!

Damn it!!!

A month later, Hubbert replied to Romulo with a detailed explanation of why he believed the e-mail was inappropriate, to which Romulo replied, in part,

If you feel that my enthusiasm to take initiative is inappropriate and in violations [sic], then your approach to email me my behaviors I feel is targeting me by documenting how inappropriate I am.

You have not taken any initiative to address this issue that is important to me and my wellbeing. Enthusiasm is not in my job description and will not take any more initiative outside my work duties per your expectations.

Romulo's coworkers expressed concern about Romulo's behavior toward Hubbert. At trial, Stephanie Talley, a coworker of Romulo, recalled a meeting she was in with Romulo and Hubbert. Talley testified that "there was a confrontation or conflict between [Hubbert] and [Romulo] that I was unaware of at the time. . . . I felt like anything that [Hubbert] said[,] there was going to be a contradictory response [from Romulo]." She stated that Hubbert was trying to "de-escalate the situation," and she did not recall Hubbert raising his voice or demeaning Romulo in any way. Eastwood also testified about Romulo's behavior in meetings. Eastwood testified that Romulo would occasionally get "very heated" and "argumentative." Eastwood noted that Hubbert was always respectful to Romulo.

In October 2016, in response to an e-mail from Hubbert concerning office equipment, Romulo wrote, "Don't need anything or want anything from you. Thank you

for your pleasant demeanor!  Just a no body!! . . . Thank you for all you do[,] and hope we all get what we all deserve and coming for us!!  Best wishes!"  Romulo copied his coworkers in his response to Hubbert.  After receiving the email, one coworker contacted Hubbert and stated they did "not feel comfortable lately with [Romulo] and his outbursts," and asked if "there [is] anything that has been done or is going to be done?"

In November 2016, Romulo requested a vacation day, which Hubbert approved. But Hubbert neglected to update his tracking folder with the approval, and Romulo did not update the leave calendar.  Following the vacation day, believing Romulo had an unexcused absence, Hubbert set up a meeting with Romulo.  After realizing his mistake, Hubbert apologized for forgetting to update his tracking folder and told Romulo he would work to implement a new and improved leave tracking mechanism.

In February 2017, Romulo e-mailed Hubbert asking whether he could take a personal holiday because of icy road conditions.  Hubbert responded that "[t]ime loss incurred by an employee due to inclement weather may be charged against vacation, compensatory time, personal holidays, other appropriate leave balances, or time off without pay."  Confused by the use of "may be," in Hubbert's e-mail, Romulo responded, "Your email says, 'maybe.' . . . Again, ok to allow me to use personal holiday for the last two days, that is yesterday and today and NOT use vacation, compensatory time and / or time off without pay??"  Hubbert responded, apologized for the misunderstanding of "may be," and confirmed Romulo could use his personal day.  At

8

trial, Hubbert testified that he did not intend any disciplinary action with his e-mail, he only wished to provide clarity on personal day policies.

In March 2017, Hubbert again e-mailed Romulo concerning his work attendance, noting Romulo had "multiple unexcused absences from work." The e-mail included SPU's workplace attendance expectations, and advised Romulo that a failure to address the issue may result in disciplinary action, but no action was taken at the time. In July 2017, after Romulo continued to show up late to work, Hubbert recommended Romulo be suspended for three days. At trial, Hubbert testified that before resorting to recommending a suspension, he provided both verbal and written reminders to Romulo concerning his tardiness. Additionally, Hubbert scheduled three "fact-finding" meetings for Romulo with HR, where Romulo was given a chance to share his side of the story. Despite mandatory attendance, Romulo walked out of the first meeting and failed to attend the second. Ultimately, Romulo was suspended.

<u>Procedural History</u>

In 2018, Romulo initiated a complaint against the City for retaliation, wrongful discharge in violation of public policy, and discrimination in violation of the WLAD. At trial, Romulo claimed he was terminated in violation of public policy for raising concerns that the City was endangering the public's drinking water. Romulo also contended his termination, as well as various other alleged adverse employment actions, were in retaliation for his 2007 lawsuit. The jury returned a verdict in favor of the City on all claims. Romulo appealed. On appeal, this court affirmed the jury's determination that

Romulo's termination did not violate public policy or WLAD, but the court remanded "with regard to Romulo's WLAD retaliation claim to the extent it is based on employment actions short of termination." *Romulo*, slip op. at 31.

Before the second trial, Romulo served written discovery on the City. The interrogatories included questions related the City's backflow compliance process, including whether any backflow assemblies had failed and whether those failures were linked to Legionnaires' disease at the site. The City moved for a protective order allowing it to not respond to the requests, contending the requests addressed Romulo's wrongful termination claim, which was not at issue on remand. Romulo claimed the discovery requests were relevant to the "34 possible adverse employment action[s]" identified by the Court of Appeals, and he expected the discovery to show "that some of the concerns he raised were validated over time." The court granted the City's motion for the protective order. A handwritten note in the order stated, "The Court of Appeals decision in this case articulates 9 possible adverse actions which could form the basis for [Romulo's] one remaining claim. Had the court intended the list to be partial, it could have indicated as such." Romulo moved the court to reconsider the protective order and hold an evidentiary hearing pursuant to *Henderson v. Thompson*, 200 Wn.2d 417, 518 P.3d 1011 (2022).[5] The court denied this motion.

---

[5] A *Henderson* hearing is an evidentiary hearing the trial court must grant if a party presents a prima facie showing of evidence that, if "taken as true, permits an inference that an objective observer who is aware of the influence of implicit bias could view race as a factor in the jury's verdict." *State v. Berhe*, 193 Wn.2d 647, 666, 444 P.3d 1172 (2019).

<u>Trial</u>

In pretrial hearings, the trial court reiterated that only the nine adverse employment actions identified by the Court of Appeals were at issue on remand. The court clarified that to allow any employment action against Romulo to be considered as an adverse employment action would not be fair because, without a clear list, the City "wouldn't be able to offer up non-retaliatory reasons for why these things happened." Romulo disagreed, maintaining the Court of Appeals never limited the list of adverse employment actions to the nine articulated in its opinion. Romulo stated he felt they were "going down that same road as we did last time" and suggested the judge consider recusing themself. The judge declined this request.

During trial, the jury heard testimony from Romulo, Roberson, Hubbert, and three of Romulo's former coworkers at SPU: Fair, Eastwood, and Talley. During his testimony, Hubbert elaborated on the concerns he had about Romulo during his time at SPU, including customer complaints, work attendance, and behavior at work.

Hubbert also addressed the concerns that Romulo raised in his complaint about Hubbert limiting his access to the work group's database, XC2. Hubbert clarified that he did not limit Romulo's access to XC2 and never offered training to other senior inspectors that he did not also offer to Romulo. Hubbert explained that during the applicable time, the XC2 program was being revamped, which affected the inspectors' ability to input new information. Hubbert communicated this to all senior inspectors, including Romulo. Romulo reached out to Hubbert with questions about inputting new

information in XC2 multiple times. In response to Romulo's e-mails, Hubbert provided information about the changes to the system and told Romulo to see him if he had any additional questions.

After closing arguments, the parties again went over the jury instructions. The parties disagreed on jury instructions 9 and 11, which concerned the "adverse employment actions" component of Romulo's claim. First, Romulo stated that he intended to add three more adverse employment actions to the list of nine that the Court of Appeals had specified, and he would like them to be included in jury instruction 9.[6] The three alleged additional actions were (1) failure to hire, (2) additional written discipline, and (3) out-of-class opportunities. Believing the Court of Appeals limited the number of adverse actions to nine, the trial court did not add the additional actions to the jury instruction.

Romulo also disagreed with how jury instruction 9 was ultimately worded. The instruction read, in pertinent part:

> To establish a claim of unlawful retaliation by the City of Seattle, Mr. Romulo has the burden of proving both of the following propositions:
>
> 1) That Mr. Romulo had participated in a proceeding to determine whether discrimination or retaliation had occurred; and
>
> 2) That a substantial factor in the City's decision to engage in the alleged adverse employment actions at issue was Mr. Romulo's participation in a proceeding to determine whether discrimination or retaliation had occurred.
>
> If you find from your consideration of all of the evidence that both of these propositions has been proved, then your verdict should be for Mr. Romulo on this claim. On the other hand, if any one of these

---

[6] During discussions, the court's jury instruction 9 was the City's proposed jury instruction 8, and Romulo's proposed instruction 12.

12

propositions has not been proved, your verdict should be for the City on this claim.

The alleged adverse employment actions at issue are:
(a) Mr. Romulo's alleged negative evaluations; (b) Mr. Hubbert's alleged treatment of Mr. Romulo in meetings; (c) the August 2016 e-mail in which Mr. Hubbert described Mr. Romulo's "draft comments" circulated following a meeting as "inappropriate;" (d) the February 2017 email in which Mr. Hubbert distinguished "may be" from "maybe;" (e) Mr. Hubbert's denial of Mr. Romulo's request to attend the full FACES conference; (f) Mr. Hubbert's mistaken belief that Mr. Romulo had taken an unapproved vacation day; (g) Mr. Hubbert's allegedly limiting Mr. Romulo's access to XC2 and not providing him XC2 training; (h) the March 2017 written reprimand for unprofessional and inappropriate behavior; and (i) Mr. Hubbert's recommending Mr. Romulo be suspended for his late arrivals.

First, Romulo suggested adding "at least one" to modify "adverse employment action" to clarify that he only needed to show one adverse employment action occurred, not all nine. Romulo also objected to the formatting of the list of adverse employment actions. Romulo contended using "and" at the end of the list instead of "or" was confusing and could lead the jury to think they had to find all nine adverse employment actions occurred to rule in his favor. The court noted it would look at the instruction, but it did not think the instruction would be misleading for the jury. Ultimately, "and" was used.

Romulo also objected to the definition of "adverse" in jury instruction 11.[7] As given, the instruction read:

The term "adverse" means unfavorable or disadvantageous. Adverse employment actions involve a change in employment that is more than an inconvenience or alteration of one's job responsibilities.

---

[7] During discussions, the court's jury instruction 11 was the City's proposed jury instruction 10, and Romulo's proposed instruction 12.

An employment action is adverse if it is harmful to the point that it *would* dissuade a reasonable employee from making a complaint of discrimination, harassment, or retaliation. Whether a particular action is adverse is judged from the perspective of a reasonable person in the plaintiff's position.

(Emphasis added.) Romulo contended the definition should read, "The term 'adverse' means unfavorable or disadvantageous. An employment action is adverse if the employer's actions are harmful to the point that they *could* well dissuade a reasonable worker from making or supporting a charge of discrimination or retaliation." (Emphasis added.) The City put forth the same definition, but the word "would" replaced "could." The City's instruction also included the sentence, "Adverse employment actions involve a change in employment that is more than an inconvenience or alteration of one's job responsibilities." Romulo objected to this instruction. The court adopted the City's version, noting it was more similar to the Washington Pattern Instructions (WPI).

The jury returned a verdict in favor of the City. Romulo appealed.

ANALYSIS

Jury Instructions

Romulo contends the trial court committed legal error and abused its discretion when it gave jury instructions 9 and 11, because the instructions misstated the law and deprived him of the opportunity to argue his theory of the case. The City claims Romulo cannot legally raise these issues now, and even if he can, the jury instructions are supported by law. We conclude Romulo properly raises the issues, but the jury instructions did not misstate the law or deprive Romulo of the opportunity to argue his case.

"We review a trial court's decision to give a jury instruction 'de novo if based upon a matter of law, or for abuse of discretion if based upon a matter of fact.' " *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 767, 389 P.3d 517 (2017) (quoting *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009)).  A court abuses its discretion when its decision is "is based on untenable grounds or untenable reasons." *Kappelman*, 167 Wn.2d at 6.

"Jury instructions are sufficient if they allow the parties to argue their theories of the case, do not mislead the jury and, when taken as a whole, properly inform the jury of the law to be applied." *Hue v. Farmboy Spray Co., Inc.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995).  Generally, the trial court has discretion to decide whether to give a jury instruction and how the instruction is worded.  *Goodman v. Boeing Co.*, 75 Wn. App. 60, 68, 73, 877 P.2d 703 (1994).  But, "[w]here substantial evidence supports a party's theory of the case, trial courts are required to instruct the jury on the theory."  *Taylor*, 187 Wn.2d at 767.  Substantial evidence " 'must rise above speculation and conjecture.' "  *Beard v. Everett Clinic, PLLC*, 32 Wn. App. 2d 833, 878, 558 P.3d 478 (2024) (quoting *Fergen v. Sestero*, 174 Wn. App. 393, 397, 298 P.3d 782 (2013)), *review granted in part*, 4 Wn.3d 1037 (2025).

An erroneous jury instruction—one that misstates the law, is misleading, or does not allow the party to argue their theory of the case—is reversible only if it is prejudicial. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012).  We assume prejudice occurs when " 'the instruction contains a clear

misstatement of the law,' " but if the instruction is merely misleading, prejudice must be demonstrated. *Hendrickson v. Moses Lake Sch. Dist.*, 192 Wn.2d 269, 281, 428 P.3d 1197 (2018) (quoting *Anfinson*, 174 Wn.2d at 860). An error in a jury instruction is harmless error if it is " 'trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.' " *Anfinson v. FedEx Ground Package Sys., Inc.*, 159 Wn. App. 35, 44, 244 P.3d 32 (2010) (quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977)), *aff'd*, 174 Wn.2d 851, 281 P.3d 289 (2012).

    1.  <u>Juror Instruction 9</u>

Romulo claims jury instruction 9 was prejudicial because it misstated the law and misled the jury. He also alleges the trial court abused its discretion when it limited the list of adverse employment actions to nine. The City maintains the jury instructions informed the jury of the law to be applied, and the court did not abuse its discretion when it limited the list of adverse actions. We conclude the instruction did not misstate the law and, while the court erred when it concluded the Court of Appeals limited the number of adverse employment actions, the error was harmless.

The WLAD protects employees from retaliation by an employer for engaging in statutorily protected activity. *Boyd v. State*, 187 Wn. App. 1, 11-12, 349 P.3d 864 (2015). Retaliation is defined as *any* adverse employment action that "involves a change in employment that is more than an inconvenience or alteration of one's job responsibilities." *Boyd*, 187 Wn. App. at 13.

16

### a. Misstatement of Law / Misleading

Here, Romulo contends jury instruction 9 was ambiguous and permitted the jury to interpret it as an incorrect statement of the law. Romulo maintains the wording of the instruction conveys that he must prove that retaliation motivated the City in all the adverse employment actions at issues, not just one. In pertinent part, jury instruction 9 stated,

> To establish a claim of unlawful retaliation by the City of Seattle, Mr. Romulo has the burden of proving
>
> . . .
>
> [t]hat a substantial factor in the City's decision to engage in the alleged adverse employment actions at issue was Mr. Romulo's participation in a proceeding to determine whether discrimination or retaliation had occurred.

The instruction then listed the nine adverse employment actions at issue, joining the final instruction with the conjunction "and." Romulo alleges that by declining to adopt his proposed instruction—adding "at least one" to modify "alleged employment actions"[8] and using "and" instead of "or" when listing the nine actions—the jury was left with an ambiguous instruction implying he must prove all the adverse actions were retaliatory.

Even if instruction 9 was ambiguous, as Romulo alleges, the instruction cannot be read in isolation. Jury instructions must be read as a whole. *Hue*, 127 Wn.2d at 92. Jury instruction 6 informed the jury what action by an employer amounts to retaliation, and it clearly identified that only one adverse employment action is needed to amount to retaliation: "If a supervisor performs an act motivated by retaliatory animus that is

---

[8] Romulo's proposed instruction stated, "That a substantial factor in the City's decision to engage in [at least one] alleged adverse employment actions at issue . . . ."

intended by the supervisor to cause an adverse employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer is liable for retaliation." (Emphasis added.) Then, jury instruction 11 defined adverse employment actions in the singular context: "An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of discrimination, harassment, or retaliation. Whether a particular action is adverse is judged from the perspective of a reasonable person in the plaintiff's position." (Emphasis added.) Taken together, the instructions communicate to the jury that Romulo alleged nine adverse employment actions occurred, but Romulo only needed to show one adverse action occurred to prove retaliation.

In addition, both parties clarified in their closing arguments that the jury only needed to conclude one adverse employment action occurred to find in favor of Romulo. In his closing argument, Romulo stated, "[W]e gave you nine potential adverse employment actions, and you only need one of them, and [Romulo] wins. We don't need . . . to prove all of them, we just need to prove one." In the City's closing argument, it asserted the jury should rule in favor of the City, "unless Mr. Romulo has proven to you that a substantial motivating factor in any of those actions was his filing his 2007 lawsuit." Both parties made clear that the jury needed to find that only one adverse employment action occurred to rule in favor of Romulo. Because the jury instructions did not require Romulo to prove more than one adverse employment action occurred, they were not misleading or a misstatement of the law.

18

### b. Nine Adverse Employment Actions

Romulo also contends the trial court erred in giving jury instruction 9 because it erroneously limited the number of adverse employment actions, thereby preventing him from arguing his theory of the case. Romulo asserts the trial court misstated the court's opinion in *Romulo* when it concluded "the Court of Appeals specifically gave us the nine alleged adverse actions that they thought this Court's jury instruction did not account for." We agree with Romulo that this court did not intend to limit the list of adverse actions that may be considered on remand, but conclude the trial court's error was harmless.

When we issued our opinion in *Romulo*, we opined, "Romulo asserts that he presented evidence of a number of possible adverse employment actions, short of termination, that would have supported his WLAD retaliation claim, including: . . . ." Slip op. at 20. By using the word "including," we did not constrain the list to only those nine adverse employment actions. Accordingly, it was error for the trial court to interpret the list as comprehensive. But the error was harmless because Romulo only identified three alleged additional adverse actions he wanted included, and the evidence he presented was conclusory and based on conjecture and, therefore, did not support his theory of the case.

While discussing jury instructions before trial, Romulo asserted the Court of Appeals did not intend to limit the number of adverse employment actions to nine and identified Romulo's 2017 three-day suspension as a possible additional action. The trial

19

court did not agree that the action should be added, but the court allowed testimony concerning the suspension and actions leading up to it. Then, during discussions after closing arguments, Romulo stated he intended to "list about three more" adverse employment actions he wanted to include in jury instruction 9. He identified (1) the City's failure to promote him, (2) the City's failure to afford him out-of-class opportunities, and (3) additional written discipline. Romulo admitted the out-of-class claim was past the statute of limitations, and he failed to identify which additional written discipline he wanted to include.[9] In his proposed jury instructions, Romulo only identified "failure to promote" as an additional adverse action to be included.

Romulo's "failure to promote" claim was not supported by substantial evidence. When Romulo first raised the "failure to promote" claim, the court stated, "So that would be a failure to hire case. We have not tried a failure to hire case." But Romulo was not asserting a failure to hire claim, he was alleging a failure to promote claim, which is recognized as an adverse employment action. *See Davis v. Dep't of Lab. & Indus.*, 94 Wn.2d 119, 126, 615 P.2d 1279 (1980); WPI 330.05. The trial court was mistaken that "failure to promote" could not be included as an adverse employment action, but it was harmless error because Romulo did not present substantial evidence that the City's decision to not promote him was in retaliation; therefore, the error did not affect the outcome of the case.

_____

[9] Romulo stated, "I think there's more written discipline than we've captured. And I—I haven't gone back to check." Romulo did not provide evidence of additional written discipline and did not raise the issue again.

At trial, Romulo vaguely alluded to the allegation that Roberson's decision to not hire him was in retaliation for Romulo's 2007 lawsuit, but never argued it explicitly, nor did he present evidence to support such a claim. Romulo also did not make an argument or produce evidence as to why Hubbert was not qualified for the job or less qualified than Romulo.

Conversely, the City presented ample testimony showing Hubbert was qualified. At the time of trial, Hubbert had a college degree in water quality technology, 19 years of experience in water operations, 13 years of experience in cross-connection control program management, and 7 years of experience as a manager. Romulo, on the other hand, had minimal management experience and only five years of experience in cross-connection control. Also, Romulo presented no evidence that Roberson was involved in the decision to not give him a second interview. In fact, Roberson testified that he was not involved in the hiring process until the final stages, after Romulo did not receive a second interview.

Romulo also presented the 2017 suspension as a possible adverse employment action. Similar to his "failure to promote" claim, Romulo produced no evidence that his 2017 suspension was retaliatory. The City's decision to suspend Romulo was based on his "continued pattern of late arrivals to work." The City presented conclusive evidence at trial detailing Romulo's late arrivals, including documentation that Romulo was more than "two minutes, five minutes sometimes" late, as Romulo testified. Conversely, Romulo provided nothing to refute the evidence offered by the City, such as an

explanation for his documented tardiness or why he did not reach out when he knew he would be late. Romulo supported his proposed additional adverse employment actions with only conjecture and speculation, which are not enough to maintain his theory and require the court to include it in the jury instruction.

The trial court did misinterpret this court's decision in *Romulo* when it concluded the opinion limited Romulo's adverse employment actions to only the nine identified. But, the error was harmless because Romulo did not present substantial evidence to support his claims that failure to promote and the 2017 suspension were adverse employment actions. Accordingly, we affirm.

2. Jury Instruction 11

a. *"Would" vs. "Well Might Have"*

Romulo contends the trial abused its discretion when it gave jury instruction 11, because the definition of "adverse employment action" misstated the law, was misleading, and commented on the evidence. The City claims Romulo cannot raise this issue on appeal because he is prevented by the "law of the case" doctrine and judicial estoppel. But, even if Romulo properly raised the issue on appeal, the City maintains the instruction was not an abuse of discretion. We conclude the issue is properly before this court, but agree with the City that jury instruction 11 was not erroneous.

First, we briefly address the City's assertion that Romulo cannot raise this issue on appeal because the definition of "adverse employment action" is law of the case and judicial estoppel applies. "The law of the case doctrine stands for the proposition that

once there is an appellate holding enunciating a principle of law, that holding will be followed in subsequent stages of the same litigation." *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). The City contends that because this court held on appeal that the trial court's jury instructions were "inconsistent with *Boyd*," the trial court was required to give the same instructions as *Boyd* on remand. But, this expands our holding in *Romulo*. We did not specify the trial court must follow the exact instructions proposed in *Boyd* on remand, nor did we provide a definition of "adverse employment action" that became the "law of the case." Accordingly, the "law of the case" doctrine is not applicable.

The City also argues that judicial estopped applies because, at the first trial, Romulo proposed the same jury instructions he now opposes. Judicial estoppel is an equitable doctrine that " 'precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.' " *Taylor v. Bell*, 185 Wn. App. 270, 281, 340 P.3d 951 (2014) (quoting *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007)). Here, Romulo proposing a jury instruction that was ultimately not used is not the same as Romulo asserting a position in court. The definition of "adverse employment action" was not before the court in Romulo's first trial, and he did not have an opportunity to argue his position concerning the definition. Therefore, judicial estoppel does not apply. Because neither the "law of the case" doctrine or judicial estoppel applies, the issue is properly before this court.

Romulo claims the trial court misstated the law when it adopted a definition of "adverse employment action" that used the word "would" rather than "could." Under WPI 330.06, "[a]n employment action is adverse if it is harmful to the point that it *would* dissuade a reasonable employee from making a complaint of [retaliation]." (Emphasis added.) The comment to WPI 333.06 cites to several cases to expand upon the definition of "adverse employment action." First, the comment cites to *Burlington Northern & Santa Fe Railway Company. v. White*, 548 U.S. 53, 67–68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). In *Burlington Northern*, the Supreme Court discussed the seriousness to which a harm must rise before it is considered "actionable retaliation." 548 U.S. at 67. The Court stated, "[A] plaintiff must show that a reasonable employee would have found the challenged action material adverse, 'which in this context means it *well might have* dissuaded a reasonable worker a charge of discrimination.' " *Burlington N.*, 548 U.S. at 678 (emphasis added) (internal quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006)). The comment also cites to *Tyner v. State*, 137 Wn. App. 545, 154 P.3d 920 (2007)—the first Washington case to adopt *Burlington Northern*—and *Boyd*, which adopted the definition of "adverse employment action" put forth in *Burlington Northern*. But, *Boyd*'s wording differs slightly from the definition in *Burlington Northern*. *Boyd* stated, "The employee must show that a reasonable employee would have found the challenged action materially adverse, meaning that it *would* have 'dissuaded a reasonable worker from making or supporting

a charge of discrimination.' " 187 Wn. App. at 13 (emphasis added) (internal quotation marks omitted) (quoting *Burlington N.*, 548 U.S. at 68).

Here, Romulo contends the WPIs and Washington case law misinterpret *Burlington Northern* by using "would" instead of "well might have" when referring to an employee's likelihood of making a charge of retaliation. First, Romulo asserts the WPIs are not law and, therefore, are not binding. *State v. Hayward*, 152 Wn. App. 632, 646, 217 P.3d 354 (2009). While true, pattern jury instructions are also considered as "persuasive as restatements of the existing law." *State v. Knapp*, 11 Wn. App. 2d 375, 382, 453 P.3d 1006 (2019). This court has stated the WPI's are "an immense aid to the bench" and "are to be used in preference to individually drafted instructions." *Humes v. Fritz Cos., Inc.*, 125 Wn. App. 477, 498, 105 P.3d 1000 (2005).

Next, Romulo maintains this court misinterpreted *Burlington Northern* in its opinion in *Boyd*. Romulo points out that *Boyd*'s wording differs from *Burlington Northern* and contends the change in wording creates a misstatement of the law. Romulo asserts a further reading of *Burlington Northern* supports the position that the Supreme Court intended a "might" standard and not a "would" standard.[10] In its opinion, the Court opines, "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's[11] remedial mechanisms" by "prohibiting employer

---

[10] In his briefs and at oral argument, Romulo implies the *Burlington Northern* standard is a "might" or "could" standard. But the *Burlington Northern* Court never used only "might" or "could." The court used the phrases "could well," "well might have," and "might well." 548 U.S. at 57, 68, 73.

[11] Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

actions that are *likely* to deter discrimination victims from complaining to the EEOC, the courts, and their employers." *Burlington N.*, 548 U.S. at 68 (emphasis added) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). Romulo maintains the use of the word "likely" reinforces the notion that the Court intended to use a broader definition than "would." Romulo also cites to *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174, 131 S. Ct. 863, 178 L. Ed. 2d 694 (2011), to support this position. In *Thompson*, the Court quotes *Burlington Northern*'s "well might have" standard: "Rather, Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " 562 U.S. at 174 (quoting *Burlington N.*, 548 U.S. at 68).

But, *Thompson* is not the only Supreme Court case citing to *Burlington Northern*. In *Muldrow v. City of St. Louis, Missouri*, the Court, discussing Title VII's anti-retaliation provision, stated, "The test was meant to capture those (and only those) employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.' " 601 U.S. 346 357, 144 S. Ct. 967, 218 L. Ed. 2d 322 (2024) (alteration in original) (quoting *Burlington N.*, 548 U.S. at 68).[12] The different phrasing of

---

[12] The City also cites to a number of federal circuit cases applying the same "would" standard used in *Boyd*. *See, e.g., Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) ("To constitute prohibited retaliation, an employment action must be 'materially adverse,' one that would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.' ") (alteration in original) (quoting *Burlington N.*, 548 U.S. at 68)); *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) ("[A] materially adverse action is one that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " (quoting *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 195 (3d Cir. 2015)).

the standard by the Supreme Court indicates the court did not distinguish between "might well" and "would" as Romulo suggests. Without more, we cannot find the language in *Boyd*, or other Washington cases citing *Burlington Northern*,[13] are inconsistent with the language used in *Burlington Northern* and *Thompson*.

Romulo maintains that "[i]f employers are liable only for their retaliatory actions that certainly *would* deter a reasonable employee from opposing discrimination, then fewer employees are likely to blow the whistle." Romulo claims "might" or "could" better reflect the intention of the WLAD and Title VII (the statute at issue in the Court's decision in *Burlington Northern*). Romulo asserts that both the WLAD and Title VII use broad language in their anti-retaliation provisions, and they do not differentiate between degrees of discrimination.[14] But, the Court in *Burlington Northern* noted not all actions rise to the level of discrimination: "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67. The purpose of defining what actions are materially adverse is so the court can "separate significant from trivial harms." *Id.* at 68. This statement is seemingly contrary to Romulo's assertion that the Supreme Court intended a broad definition of what

---

[13] *See*, *e.g., Zhu v. N. Cent. Educ. Serv. Dist.*, 189 Wn.2d 607, 404 P.3d 504 (2017) (referencing *Boyd*'s "would" standard for support, but ultimately applying a "might" standard); *Bittner v. Symetra Nat'l Life Ins. Co.,* 32 Wn. App. 2d 647, 666-67, 558 P.3d 177 (2024) (using the "would" standard).

[14] *See* RCW 49.60.210(1) ("It is an unfair practice for an employer to . . . discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.").

actions rise to the level of materially adverse. Accordingly, jury instruction 11 was not a misstatement of the law, and the court did not abuse its discretion.

### b. Change in Employment

Romulo claims the trial court misstated the law and abused its discretion by using the following sentence from the comment section of WPI 330.05: "Adverse employment actions involve a change in employment that is more than an inconvenience or alteration of one's job responsibilities." The City contends the instruction was not a misstatement of the law.[15] We agree with the City.

First, Romulo alleges the instruction is a misstatement of the law because a change in job duties can rise to the level of adverse employment action in the retaliation context. But, as case law demonstrates, this sentence does not mean an alteration of one's job responsibilities will never amount to adverse employment action. In *Burlington Northern*, the court clarified that, while "reassignment of job duties is not automatically actionable," depending on the circumstances, it can rise to the level of adverse employment action. 548 U.S. at 71. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.' " *Id*. (internal quotation marks omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)).

---

[15] The City also alleges Romulo waived any objection to this portion of the instruction because he did not alert the court to any error, but Romulo did object to this instruction at trial.

28

Washington courts have adopted the standard set forth in *Burlington Northern* and applied it in tandem with the definition of "adverse employment action" set forth in WPI 330.06—the two standards are not in conflict. *See Bittner v. Symetra Nat'l Life Ins. Co.,* 32 Wn. App. 2d 647, 665, 558 P.3d 177 (2024); *Boyd,* 187 Wn. App. at 13.[16]

Next, Romulo contends that, even if the instruction was not a misstatement of the law, it was still an abuse of discretion to include the sentence because it slanted the instructions toward the City. A jury instruction is improper if it "arguably slants the instructions towards the defense's theory of the case." *Terrell v. Hamilton*, 190 Wn. App. 489, 505, 358 P.3d 453 (2015). If the instruction indicates the "judge's personal attitudes toward the merits of the cause," it is an impermissible comment on the evidence. *State v. Ciskie*, 110 Wn.2d 263, 282-83, 751 P.2d 1165 (1988). But, when an instruction does no more than accurately state the law pertaining to an issue, it does not constitute an impermissible comment on the evidence. *Hamilton v. Dep't of Lab. & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988).

Romulo claims the inclusion of the sentence "tilted the instructions toward the City's argument that Romulo had suffered nothing more than trivialities." But the sentence simply states the applicable definition for "adverse employment actions." The

---

[16] Romulo contends the standards set forth in these cases are only dicta because the court was not determining whether a change in job duties alone was enough to amount to an adverse employment action. Romulo misinterprets the meaning of dicta. "Dicta" is a statement "not necessary to the court's decision." *Gabelein v. Diking Dist. No. 1 of Island County*, 182 Wn. App. 217, 239, 328 P.3d 1008 (2014). In each of these cases, the definition of adverse employment action was essential to the court's analysis.

court added nothing of its own to the instruction.  In addition, the trial court explicitly stated,

> The law does not permit me to comment on the evidence in any way. I would be commenting on the evidence if I indicated my personal opinion about the value of testimony or other evidence.  Although I have not intentionally done so, if it appears to you that I have indicated my personal opinion either during trial or in giving these instructions, you must disregard it entirely.

Romulo also claims the sentence was unnecessary because the court's instruction already conveyed a legal definition of "adverse employment action."  But the trial court has broad discretion in determining the language of jury instructions and, without an abuse of discretion, we will not disturb the trial court's instructions.  Here, Romulo was able to argue his theory of the case, the instruction did not misstate the law, and the instruction informed the jury of the applicable law.  Accordingly, the trial court did not abuse its discretion.

<u>Discovery</u>

Romulo claims the trial court abused its discretion when it limited the discovery Romulo could conduct and the evidence he could offer at trial.  The City maintains the trial court properly granted its motion for a protective order because the evidence Romulo sought was related to his already adjudicated wrongful termination claims.  We agree with the City.

We review a trial court's discovery order for abuse of discretion.  *A.G. v. Corp. of Cath. Archbishop of Seattle*, 162 Wn. App. 16, 20-21, 271 P.3d 249 (2011).  A court abuses its discretion when its decision is "manifestly unreasonable, or exercised on

untenable grounds, or made for untenable reasons." *Archbishop of Seattle*, 162 Wn. App. at 21. A decision is exercised on untenable grounds or made for untenable reasons if it is not supported by facts in the record or it applies the wrong legal standard. *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423-24, 138 P.3d 1053 (2006).

An appellant's brief must contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3. When an appellant fails to provide any authority or cite to the record to support an issue, we may decline to consider it on appeal. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986).

First, Romulo's assignment of errors states the trial court erred when it granted the City's protection order and prohibited Romulo from offering evidence of other adverse employment actions. Despite appealing the protection order, Romulo does not discuss it in his argument. The protection order dealt specifically with Romulo's interrogatories requesting information "pertain[ing] to possible adverse employment actions related to the XC2 data base . . . and . . . pertaining to the UW Medical Center." Because Romulo does not address either of these issues on appeal or provide argument for why the protection order was error, we decline to address this issue.

<u>Recusal</u>

Romulo insists that, if the case is remanded, it should be assigned to a different judge. Because we are not remanding the case, this issue is moot.

31

## Attorney Fees

Romulo claims if this case is reversed and remanded for a new trial, the trial court should be instructed that it may award Romulo attorney fees on appeal if he ultimately prevails. Because Romulo does not prevail, attorney fees are not appropriate.

We affirm.

_Smith, J._

WE CONCUR:

_Chung, J._        _, ACJ_